The People v. Clarke.

---

The revised statutes had provided that a notice of trial should be served at least fourteen days *before* the first day of the court. It was held to mean fourteen full days, exclusive of the day of service ; and a notice of trial served on the *ninth*, for the 23d day of the same month, was decided to be insufficient.

I am satisfied the thirty days had not expired when the affidavit was made ; and without expressing any opinion on the other questions, I think the report of the referee should be set aside.

---

Montgomery Special Term, Nov. 1850.    *Cady*, Justice.

The People of the State of New-York *vs.* Geo. Clarke.

The 433d section of the code, authorizing an action to be brought by the attorney general, in the name of the people, for the purpose of vacating or annulling letters patent granted by the people of this state, is limited to letters patent granted *by the people*, and does not extend to letters granted by the king, prior to the revolution.

Where, in an action brought by the attorney general, to vacate letters patent granted by the king of Great Britain, more than one hundred years since, the facts stated in the complaint show that the plaintiffs never had any title or possession, and do not show that any right of action has accrued to the people, or to the king under whom they claim, within forty years next before the commencement of the action, the action can not be maintained.

If, in such an action, the defendant's answer, to which the plaintiffs demur, shows, in connection with the complaint, that any right of action which the people may have had, is barred by the statute of limitations, the defendant will be entitled to judgment on the demurrer.

Where letters patent are sought to be vacated on the ground that they were granted upon false suggestions, it is not enough to prove that the suggestions were false. It must also appear that they were *material*.

The fact that some of the grantees in a patent were trustees for one of their number, and released their interest to him, soon after the grant was made, is no evidence of fraud, in obtaining the patent.

Where a patent was granted by the king of Great Britain, in 1737, of lands in this state, subject to the payment of an annual rent to the king or his suc-

The People *v.* Clarke.

cessors, and 24 years afterwards the colonial legislature passed an act to provide for the more effectual collecting of quit-rents, due and to become due from all the grants and patents within the colony, including the one in question, *held* that such act was to be deemed a confirmation of the original grant.

How far the constitution of this state, made in 1777, is to be regarded as a confirmation of grants previously made by the king.

A proceeding to vacate letters patent, because the condition on which they were granted has not been performed, is not a proceeding in equity, but at law.

An action brought by the attorney general, in the name of the people, to annul letters patent, is within the statute of limitations, and will be barred by an adverse possession for forty years.

Whatever will constitute an adverse possession, within the meaning of the provisions of the revised statutes (2 *R. S.* 292, §§ 9 *to* 12,) if continued forty years, under the acts of 1788 or 1801, gives to the person in possession a perfect title, as against the people.

The legislature, by the revised statutes, intended to put an end to prerogative; and that the same rules should be applied to an action between the people and a citizen, as between one citizen and another.

SCIRE FACIAS to vacate a patent for land in the county of Montgomery, made to the ancestor of the defendant, prior to the revolution. So much of the pleadings as related to the questions examined, were as follows :

"The People of the State of New-York, by Levi S. Chatfield their attorney general, complain of George Clarke : That heretofore, and on the 2d day of August in the year 1737, George Clarke, the ancestor of the said defendant, was lieutenant governor of the province of New-York, and, as such, was a member of and president in the colonial council of said province ; that to such lieutenant governor, with the advice and consent of the colonial council, was intrusted and committed the power of granting the lands of the Crown of Great Britain and Ireland, and the issuing of letters patent therefor, for the purpose of occupation and settlement, subject to the limitation that not more than two thousand acres should be granted to any one occupant or settler. That at a meeting of said colonial council, held at Fort George in New-York on the said 2d day of August, 1737, at which were present the said Lieutenant Governor George Clarke, Mr. Kennedy, (chief justice,) Mr. Courtlandt, Mr. Lane, and Mr. Hors-

The People *v.* Clarke.

mander, members of said colonial council, the said Lieutenant Governor George Clarke presented the petition of one William Corry, late of Ireland, addressed to said lieutenant governor, setting forth in substance, that there was a large tract of land in the Mohawk country vested in the crown, situated at or near Aries creek, Ticonderoga creek, Godoriety patent, and Schoharie: that the petitioner, and several other persons concerned with him, having, upon the encouragement of the government published in a printed advertisement of the 5th of November, 1734, engaged a sufficient number of families, of their friends and acquaintances, to remove from Ireland, and to settle 100,000 acres of land in the province of New-York, if the petitioner could find so much fit for cultivation and improvement, had undertaken a voyage to such province for that purpose, at great expense, hoping to find that quantity at the place above mentioned. The petitioner therefore prayed a grant to him, and to such other persons as he *should name* to be inserted in such grant, the said quantity of 100,000 acres of land, under such restrictions as were directed by his majesty's commission and instructions; that the petitioner, and those concerned with him, might thereby be enabled to make good their engagements with their friends and acquaintances in Ireland, and be in readiness to transport them from thence to the said province.

That thereupon the said Lieutenant Governor George Clarke withdrawing from said council, the other of said members resolved into a committee to consider upon such petition, and agreed upon their report; and the said lieutenant governor, being made acquainted therewith, returned to the said council chamber and took his seat, then ordered that said report be made immediately. Mr. Horsmander, the chairman of said committee, reported that the said committee, having weighed and considered the said petition, were of the opinion that the said Lieutenant Governor George Clarke might grant the prayer thereof, with the restriction that the governor, or those concerned with him, should within seven years, to be computed from the first day of May then next ensuing, settle fifty families on the said land; which report was agreed to and approved of, and the

said council did advise and consent that the said Lieutenant Governor George Clarke should grant to the said petitioner the said quantity of 100,000 acres aforesaid according to the said petition.

That upon the aforesaid order being made, a warrant of survey issued to the surveyor general of the said province, Cadwallader Colden, who, together with said Lieutenant Governor George Clarke and Receiver General Archibald Kennedy, were commissioners appointed by his majesty's instructions for setting out all lands to be granted in the said province, directing said surveyor to survey and lay out for Samuel Heath, William English, John Dyer, Francis Sylvester, Catharine Corry, William Crosby (sheriff of New-York,) Elizabeth Mills, Catharine Hirst, Timothy Bagley, Charles O'Neil, Sarah Hirst and Daniel Bagley (persons named and appointed by said William Corry as trustees to and for his use,) and for himself the said William Corry, the quantity of 26,000 acres within the limits and bounds of the tract of land aforesaid. And the said commissioners, Lieutenant Governor George Clarke, Archibald Kennedy and Cadwallader Colden, by their certificate dated October 24th, 1737, a copy of which is hereinafter contained, certified that in pursuance of the said order, they had set out certain premises then situated in the county of Albany, and now in the county of Montgomery, and then the property of the crown of Great Britain and Ireland (the particular metes and bounds whereof are set forth in the hereinafter mentioned letters patent and certificate,) for the aforesaid Samuel Heath, William English, John Dyer, Francis Sylvester, Catharine Corry, William Crosby, Elizabeth Mills, William Corry, Catharine Hirst, Timothy Bagley, Charles O'Neil, Sarah Hirst and Daniel Bagley.

And these plaintiffs further show, that subsequently, and on or about the 19th day of November, 1737, letters patent under the great seal of the colony of New-York, signed by the Lieutenant Governor George Clarke, and bearing date on the day last mentioned, were issued by the said Lieutenant Governor George Clarke, to the said William Corry and his associates

The People v. Clarke.

aforesaid, of which said letters patent, and of said warrant of survey, the following are copies :

[The letters patent recite the contents of the petition to have been as above stated ; that the council of the province did advise and consent that the lieutenant governor should grant the prayer of the petition ; that a warrant of survey was issued to lay out for William Corry and twelve others a tract of land ; that a survey was made and returned, particularly describing the boundaries of a tract of 25,400 acres, for which letters patent were issued, dated on the 19th of November, 1737, reserving to the king the payment of two shillings and sixpence rent on each 100 acres, payable to the king's collector or receiver general yearly and every year thereafter, and upon the condition that the grantees should, within three years next after the date of the letters patent, effectually cultivate at least three acres of every fifty acres of the land granted ; and also on condition that if the grantees should not, within seven years after the first day of May, 1738, settle thirteen families upon the lands granted, then the grant was to be void. It is unnecessary to state the contents of the certificate of survey.]

"As by the said letters patent and warrant of survey, of record in the office of the secretary of the state of New-York, more fully appears.

And these plaintiffs further aver, that since the issuing of the said grant, they are informed, and have discovered and believe, that the names of all the grantees or parties in such grant named, except that of the said William Corry, were used in trust for the joint use of the said William Corry and of the said Lieutenant Governor George Clarke ; and that shortly after the granting thereof, and on or about the 14th or 15th day of December, 1737, they the said other grantees, in pursuance of the understanding and agreement under which their names were so used as grantees in said letters patent, had conveyed to said Corry all their interest described in the said grant, by deeds of lease and release ; and also that prior to the presentation of the aforesaid petition, and to the issuing of the said letters patent, there was an agreement between the said William Corry and

the said Lieutenant Governor George Clarke, that the said Lieu-
tenant Governor Clarke should pay half the charges and ex-
penses of surveying the said land, and of procuring the patents,
and should be interested in one half the grant of 100,000 acres
of land; and that one equal moiety of the 25,400 acres granted
by the aforesaid letters patent to the said William Corry and
his associates, was so granted in trust for the said Lieutenant
Governor George Clarke; and that in compliance with the
agreement and trust, the said William Corry, by deed of release
to said Lieutenant Governor George Clarke, dated February
18th, 1738, released to the said George Clarke, his heirs and
assigns forever, 12,700 acres in, and the moiety of, the said
premises granted in and by said grant or letters patent.

And the said plaintiffs further alledge, that each and every
of the allegations contained in the said petition of the said Wil-
liam Corry was false and fraudulent, and that the grantees to
whom said letters patent issued, or any or either of them, had
never removed from Ireland, or undertaken a voyage therefrom
under the inducements alledged in said petition, or any similar
inducements, and that it never was the intention of the several
persons named as grantees in said grant or letters patent, or
any of them, to take or receive a grant of the lands thereby con-
veyed, with the bona fide purpose of becoming the occupants or
settlers upon such lands, but that the names of each and every
of said grantees, except of said William Corry, were fraudu-
lently used therein by said Corry; and said Lieutenant Gov-
ernor George Clarke concealed from the members of the said
council, and from the crown, the said interest of the said George
Clarke in procuring the said letters patent, and in and by said
petition falsely represented to said council the circumstances
under which the application thereon was made, and by means
of said false and fraudulent suggestions and misrepresentations
contained in the said petition of the said William Corry, and
the concealment of the said interest of the said Lieutenant
Governor Clarke in the procuring of the said letters patent,
induced the said committee of the colonial council to make the
hereinbefore mentioned favorable report upon the petition of the

said William Corry, and induced the said colonial council to advise and consent to the issuing of the aforesaid letters patent by the said Lieutenant Governor Clarke; and they aver that the whole of the said proceedings were a fraudulent device, on the part of the said William Corry and Lieutenant Governor George Clarke, to procure a grant of the said large tract of 25,400 acres of land to be made to said William Corry alone, and to evade the restrictions on the granting of more than 2000 acres of the lands of the crown to any one occupant or settler, and to enable the said Lieutenant Governor George Clarke by connivance with the said William Corry, and by the fraudulent means and devices aforesaid, to obtain the consent of the said colonial council to the issuing of the said letters patent, and to procure the aforesaid grant of 12,700 acres to be made indirectly, but really to himself and for his own use and benefit, in violation of his duty as Lieutenant Governor of the province of New-York, and in abuse of his trust as the agent of the crown, and contrary to law.

And these plaintiffs alledge that said letters patent were and are void by reason of the aforesaid fraudulent suggestions and misrepresentations in the said petition of the said William Corry, and by reason of the fraudulent concealment by said Corry and Lieutenant Governor Clarke, from said colonial council and from the crown, of the interest of the said Lieutenant Governor Clarke in procuring the said patent to be issued as aforesaid, and also by reason of the fraudulent conduct of said Lieutenant Governor Clarke in issuing letters patent in the granting of which he was directly interested, and for the purpose and with the design of procuring the one half of the lands thereby granted to and for his own use and benefit.

And the said plaintiffs further aver that the hereinbefore mentioned letters patent, issued and recorded as aforesaid, if they have any legal force or effect, have become and are forfeited and void by reason of the omissions of the patentees therein named to perform the conditions thereof, and they particularly alledge and aver, that the said patentees, their heirs and assigns and every of them, did omit and fail, within three

The People v. Clarke.

years next after the date of said letters patent, to settle and effectually cultivate at least three acres of every fifty acres of such the thereby granted land as were capable of cultivation, and also that the said William Corry, his heirs and assigns and every of them, and every other person concerned with the said William Corry to settle the above granted lands, did omit and fail within seven years next after the first day of May, in the year 1738, to settle thirteen families upon the tract of land granted in and by said letters patent, each of which omissions and failures was to the prejudice and injury of these plaintiffs.

And these plaintiffs further aver, that they have since recovered possession and the absolute control of the said moiety or half part of all that part of the said premises described in said grant retained by the said William Corry, and that the defendant George Clarke, a descendant of said Lieutenant Governor Clarke, now possesses and claims to own under said letters patent, by inheritance or purchase, all the said right, title and interest in the said tract of land so as aforesaid released or conveyed by said William Corry, to said Lieutenant Governor Clarke, and is tenant of parcel of said lands so released and conveyed by said Corry to his said ancestor.

Wherefore these plaintiffs pray, that unless the said defendant George Clarke show good cause to the contrary, the before mentioned grant or letters patent may by reason of the premises be adjudged to have been and to be void, and of no force or effect in law, and vacated and annulled, and the record thereof, for the reasons aforesaid, canceled, vacated and restored to these plaintiffs with costs of suit."

The defendant put in several distinct answers to the complaint, only one of which need be particularly examined, and that is as follows :

" And for a further answer to the complaint, the defendant says that no right or title to the said 12,700 acres of land devised to the defendant *as aforesaid*, (this refers to a devise to the defendant from his father, mentioned in a previous part of the answer,) or of any part thereof, has accrued to the plaintiff within the space of forty years before the commencement of this

The People *v.* Clarke.

suit; and that neither the said plaintiffs nor those under whom they claim, have received the rents and profits of the said 12,700 acres, or of any part thereof, within the said space of forty years; and that no verdict, judgment or decree whatever, in any court of record or in any other court, has been given for said 12,700 acres or for any part thereof, in favor of the said plaintiffs or of any patentee or grantee of the said plaintiffs, his heirs or assigns, within the said space of forty years; but on the contrary the defendant avers, that during the whole of the said space of forty years before the commencement of this suit, and ever since the conveyance by Edward Clarke to the defendant's father as hereinbefore mentioned, (this refers to an allegation in a former part of the answer, that Edward Clarke, being possessed of the said land, in the year 1791, sold and conveyed the same to the defendant's father,) he, the defendant, and his said father and those deriving title from the defendant, have respectively been in the uninterrupted, exclusive and actual possession and enjoyment of the said lands so conveyed to his said father, and have received the rents, issues and profits thereof, claiming in good faith to own and be seised of the said lands, and all the hereditaments thereunto belonging, in fee, adverse to the plaintiffs and to every person whatever."

To this answer the plaintiffs demurred, and stated as the grounds of demurrer, "that said several matters do not, nor do any or either of them constitute any defense to the matters alledged in said complaint; that no grant or patent from the crown of Great Britain, prior to the revolution, or from the people of the state of New-York, since that event, is set up or pretended therein; that no such adverse possession as is set up in that part of said answer can be taken or held against the plaintiffs; that no statute is referred to, nor is the benefit of any particular statute of limitation claimed or pretended as a bar to the relief demanded by the complaint."

*John Van Buren,* for the plaintiffs.

*N. Hill, Jun.* and *S. Beardsley,* for the defendant.

The People v. Clarke.

CADY, J. The questions now to be decided are questions of law, arising on the face of the complaint, the answer of the statute of limitations and the demurrer thereto.

The plaintiffs have commenced this action to vacate letters patent granted by King George the second, on the 19th day of November, 1737, to William Corry and others, for 25,400 acres of land now situated in the county of Montgomery. The grant was made upon the conditions that the grantees should, within three years after the date of the patent, effectually cultivate three acres of every fifty acres, and within seven years after the first day of May next after the date of the letters patent, settle thirteen families on the land granted. The grant was also made subject to the payment of a rent of two shillings and six pence sterling, for each one hundred acres of the land granted. The plaintiffs seek to have the letters patent vacated, for four causes, which would by the common law have required different modes of proceedings:

First. Because the letters patent were obtained upon false suggestions.

Secondly. Because the interest of the Lieutenant Governor George Clarke, in procuring the letters patent, was concealed from the council and from the crown.

Thirdly. Because the names of twelve of the patentees were made use of in trust for William Corry; and,

Fourthly. Because the conditions of settlement have not been performed.

If the king might successfully have taken these four objections to the letters patent, his right of action as to the first three accrued as soon as the letters were issued; and as to the fourth, on the 19th of November, 1740, and the 2d of May, 1745. If there was good cause for the first objection to the letters patent, the king was entitled to a *scire facias* to repeal them. If the second and third objections were well founded, the king might have had a bill in equity to compel a surrender of the letters patent. (*The Attorney General* v. *Vernon, Brown and Boheme*, 1 *Vern. Rep.* 277, 281, 383, 388.) If the conditions of settlement were not performed, the king's remedy was by an

inquest. By the first three objections, the plaintiffs seek to have the letters patent repealed because they were tainted with fraud. By the fourth objection it is assumed that the letters patent were originally valid, but that the grantees have forfeited the estate granted, by the non-performance of the conditions that three acres of every fifty acres should be effectually culti- vated within three years, and that thirteen families should be settled on the land within seven years after the first day of May, 1738.

What authority have the plaintiffs to unite these four objections in one action, commenced to vacate the letters patent? If they have any such authority, its origin must be found in 2 *R. S.* 578, § 12, and the subdivisions of that section, which are as follows: "A writ of *scire facias* may also be issued out of the supreme court of this state, in behalf of the people of this state, upon the relation of the attorney general, or of any private person, for the purpose of vacating and annulling any letters patent granted by the people of this state, in the following cases:

1. Where it shall be alledged that such letters patent were obtained by means of some fraudulent suggestion or concealment of a material fact, made by the person to whom the same were issued, or made with his consent or knowledge:

2. Where it shall be alledged that such letters patent were issued through mistake, and in ignorance of some material fact:

3. Where the patentee, or those lawfully claiming under him, shall have done or omitted any act, in violation of the terms and conditions upon which such letters patent were granted; or shall by any other means, have forfeited the interest acquired under the same."

It will be perceived that this section is in terms limited to letters patent granted *by the people of this state.*

By section 428, of the code of procedure, "the writ of *scire facias*, the writ of *quo warranto*, and proceedings by information in the nature of quo warranto were abolished. This took away the remedy given by the revised statutes. But a new remedy was given by the 433d section, which is as follows: "An action may be brought by the attorney general, in the

name of the people of this state, for the purpose of vacating or annulling letters patent *granted by the people of this state,* in the following cases :

1. When he shall have reason to believe that such letters patent were obtained by means of some fraudulent suggestions, or concealment of a material fact, made by a person to whom the same were issued or made, or with his consent or knowledge ; or,

2. When he shall have reason to believe, that such letters patent were issued through mistake, or in ignorance of a material fact ; or,

3. When he shall have reason to believe that the patentee, or those claiming under him, have done or omitted an act, in violation of the terms and conditions on which the letters patent were granted, or have, by any other means, forfeited the interest acquired under the same."

The remedy given in this section, as in the revised statutes, is in terms confined to letters patent granted *by the people of this state.*

It was insisted on the argument, by the counsel for the plaintiffs, that the letters patent in this case, granted by George the second, in the year 1737, and 38 years before the plaintiffs claimed to be sovereign and independent, were to be deemed to be letters patent granted by the people of this state. But the argument of the learned counsel failed to satisfy me, that an act done by George the second, could be regarded as done by the plaintiffs ; and unless the letters patent granted by George the second can legally be adjudged to have been granted by the people of this state, there is no law by which this action can be maintained. If, in contemplation of law, the letters patent set out in the complaint were granted by the people of the state of New-York, it ought to have been alledged in the complaint that they were so granted. But instead of that, it is alledged, that, " on or about the 19th day of November, 1737, letters patent, under the great seal of the *colony* of New-York, signed by the Lieutenant Governor George Clarke, and bearing date on the day last mentioned, were issued by the said Lieutenant Governor George Clarke, to the said William Corry," &c. The act of the

9th of March, 1793. chap. 44, shows, that the legislature made a distinction between letters patent granted under the great seal of this state, and letters patent granted under the great seal of the colony of New-York. By the first section of that act, it was made the duty of the secretary of this state, as soon as might be, after the first day of January, 1801, to make out an abstract of all lands granted by letters patent under the great seal of this state, which contained a condition of actual settlement, and deliver the same to the surveyor general, and he was to make inquiry, and if he found any lands granted on such condition which were not actually settled, he was to give notice to the attorney general, who was, without delay, to cause an inquisition to be taken, to ascertain whether the lands had been forfeited by the non-performance of such condition. By the third section of that act, it was the duty of the surveyor general, as soon as might be after the 1st of January, 1798, to make inquiry if any lands within this state were granted while this state was the colony of New-York, by letters patent under the great seal of the said colony, on condition that actual settlement should be made thereon ; and if he found any lands so granted, and the condition not performed, he was to make a report thereof to the attorney general, who was, as soon as might be, to proceed for the recovery thereof by the people of this state. To that section was added this proviso : " provided always, that nothing in the last preceding section mentioned shall extend to any lands for which the quit-rent and commutation for quit-rents shall have been paid, or may hereafter be paid, in conformity to law." (3 *Greenl. L. N. Y. p.* 70.) This may, with much propriety, be deemed a legislative enactment, that no patent granted by the crown should be forfeited to the people, in case the person claiming under the patent had paid or should thereafter pay the quit-rents and commutation for quit-rents. The duty which was imposed upon the surveyor general and the attorney general by the third section of this act, has, as to the lands in question, been neglected for 52 years, unless the surveyor general on examination found that these lands had been settled, or that the quit-rents and the commutation for quit-rents had been paid.

The People *v.* Clarke.

The first section of this act was in substance re-enacted in 1801, by 1 *R. L.* 301, § 16 ; but the third section was not re-enacted, nor was it repealed. The general repealing clause of the act of the 8th of April, 1801, extended only to all acts and parts of acts theretofore passed, which came within the *purview* and operation of any act passed during the then session of the legislature, commonly called the revised acts. The third section of the act of 1793, ch. 46, (unless it lost all its force, as it probably has, by lapse of time) prescribes the only mode by which the plaintiffs can prosecute for the non-performance of the conditions of settlement, for lands granted by the crown, unless a new remedy was given by 2 *R. S.* 578, § 12, above stated. That section took effect on the first day of January, 1830, and on the 20th day of April in that year, the legislature passed an act by which it was provided as follows : " the right reserved to the state of vacating the grants made by patent, founded upon the condition that actual settlements should be made upon the lands granted, within the periods mentioned in said patents, is hereby released to the patentees, their heirs and assigns." This release of the condition rendered the third subdivision of the 12th section, above referred to, nearly useless—and there is no necessity to limit the operation of that release to patents granted by the people of the state. Citizens who then held under grants from the crown, were as well entitled to be released from the performance of the condition of settlement as those who held under grants from the people ; and if that release can be understood as extending to grants made before as well as those made after the revolution, it will furnish a perfect answer to one of the grounds upon which the plaintiffs seek to have the letters patent vacated ; and as the release is found in a public statute, it may now be taken into consideration.

Originally a scire facias to vacate a patent, might have been prosecuted in three cases. First. " When the king by letters patent granted by several letters patent one and the self same thing to several persons, the first patentee could have a scire facias to repeal the second. Secondly. When the king granted a thing upon false suggestions, he might by scire facias

repeal his own grant. Thirdly. When the king granted any thing which by law he could not grant, he might have a scire facias to repeal his own letters patent." (4 *Inst.* 88. 4 *Bac. Ab.* 416, *tit. Scire Facias on Letters Patent.*)

A *scire facias* should be founded on a record; and when it is brought for a forfeiture of the patent or other thing in another court, there ought to be an office found in such other court before the scire facias issues. (9 *Coke's Rep.* 96. 3 *Lev.* 223. 4 *Bac. Ab.* 416, *above cited.*) In some cases the king was held to be seised as soon as the inquest was found that a condition of a grant had been broken. (9 *Coke*, 95.)

The first ground on which the plaintiffs claim to vacate the letters patent is, that they were granted upon false suggestions. The false suggestions for which the king might have a *scire facias* to repeal his own letters patent, must appear upon the face of the patent; otherwise the letters patent must be vacated upon a bill in equity (*Attorney General* v. *Vernon, Brown and Boheme,* 1 *Vern.* 277, 281, 283.) The reason assigned in that case, in support of the bill, was, that no scire facias would lie, because the fraud did not appear in the body of the grant. What are the representations appearing in the body of the letters patent in this case, which are alledged to be false? That "upon the encouragement given to the petitioner and his associates by an advertisement in November, 1734, published by order of the governor of the province of New-York, with the advice and consent of the council, they had engaged a sufficient number of families of their friends and acquaintances to remove from Ireland into the said province to settle 100,000 acres of land, if the petitioner could find so much fit for cultivation and improvement, and that having for that purpose undertaken a voyage from Ireland into this province at great expense: he therefore prayed," &c. It is not enough that these suggestions were false. They must have been material, or they could furnish no cause for vacating the patent. How was it material whether the petitioner had or had not seen an advertisement published by order of the governor and council of the province? How was it material whether the petitioner and his associates

The People *v.* Clarke.

had engaged a sufficient number of families of their friends and acquaintances to remove from Ireland into said province, to settle 100,000 acres of lands ? How was it material, whether the petitioner had or had not for that purpose undertaken a voyage from Ireland into this province at great expense ? These, according to the recitals in the patent, were all matters which were past; and it was wholly immaterial to his majesty whether they were true or false.

In *Sir Thomas Wrothe's case,* (2 *Plowd.* 454, 5,) the patent recited " that Sir Thomas had been appointed by the king, gentleman usher of the privy chamber to his son Prince Edward— that he had served the prince from the feast of the annunciation of our lady, in the 36th year of his reign, until the making of the patent, and had not then received any allowance for it—he gave and granted to him for his attendance all that time as much money as the annuity of £20 amounted unto, from the said feast of the annunciation, in the said 36th year of his reign, until the making of the said patent, to be paid," &c. Sir Thomas had petitioned to be paid the annuity, but had not in his petition averred that he had done any service before the patent was issued. The court gave judgment that he should have the said sum, although he omitted to aver that he did the service before the date of the patent; and added, " for such service is a thing passed and executed, and not executory, so that the king shall not avail himself of that which is passed, and therefore such recital is not material whether it be true or false." The suggestion, concealment or ignorance, must be of a *material* fact. (*The case of Alton Woods,* 1 *Coke's Rep.* 43. 2 *R. S.* 578, § 12. *Code,* § 433.)

The king, by the letters patent, in effect, says to William Corry : " I shall not grant lands to you for any thing you have done ; but I will make the grant for the consideration that you shall pay therefor a certain rent, and within three years effectually cultivate three acres of every fifty acres of the land granted, and, by the first of May, 1745, have thirteen families settled thereon ; and if you fail to pay the rent, I shall compel you to pay : if you fail to make the settlement, I shall take the land

The People *v.* Clarke.

from you. Although you have in your petition alledged that you and your associates have engaged a sufficient number of families of your and their friends and acquaintances to remove from Ireland into my province of New-York, to settle 100,000 acres of land, yet I care nothing for that : all I ask in relation to the settlement is, that you have three acres of each fifty cultivated, and have thirteen families settled on the land in seven years from the first of May next ; and I care not whether they are Irish, Scotch, Dutch, or Yankee families." Unless the facts recited formed a part of the consideration for the grant, and I am of opinion that they did not, they were immaterial, and could at no time, have furnished any cause for vacating the patent.

The second ground for vacating the letters patent alledged in the complaint is, that the Lieutenant Governor George Clarke was interested in the grant, and that that interest was fraudulently concealed from the colonial council and the crown. A man intrusted with power by his sovereign ought not to use that power to his own advantage and to the injury of his sovereign, and if he do, he ought to be punished. But if in this case, the usual rent was reserved to the crown, and the usual condition of settlement inserted in the patent, how was the crown defrauded ? The complaint makes no suggestion that the letters patent do not contain the full rent, and all the reservations and conditions in favor of the king which were at that day usually inserted in letters patent ; nor does the complaint contain a suggestion that any fraud was practiced to the prejudice of the king. I deny that the judicial history of the world can furnish an example, where an emperor, a king, or a republic, whether heathen or Christian, has, before this, brought a subject or citizen into court to answer for a fraud committed by some person through whom he claims title, one hundred and twelve years before he was called on to answer. In the days of Methuselah, witnesses might have been found to testify in relation to a fraud one hundred and twelve years after it was committed ; but it would now be idle to attempt to find such witnesses. And does not the well being of the state, and the interest and security of individuals demand, that even sovereigns shall not com-

The People v. Clarke.

mence actions founded on transactions in relation to which no man now living is old enough to testify? The members of the colonial council, and the king, from whom it is alledged the interest of Lieutenant Governor George Clarke was fraudulently concealed, have long since returned to their original dust, and no one but Him who rules in Heaven can know what was or what was not concealed from them. If a claim so stale as this be countenanced in any court, no man holding under a colonial grant can have perfect confidence in his title.

The third objection is, that some of the patentees named in the letters patent, were trustees for William Corry, and released to him soon after the grant was made. Every lawyer who has had occasion to trace titles back to colonial grants must know, that it is not unusual to find in the secretary's office, conveyances from some of the patentees to others soon after the grant; and if such conveyances are to be regarded as evidence of fraud which will justify a court in vacating the letters patent, it would create confusion and uncertainty as to the title to lands held under grants from the crown. An objection of this kind was made at a very early day, in the cases of *Herman Le Roy and others* v. *Peter Servis and others*, (1 *Caines' Cas. in Err.* 3 ; 2 *Id.* 175 ;) *William Laight and others* v. *John Morgan and others*, (1 *John. Cas.* 429 ;) and the case of *Herman Le Roy and others* v. *Lewis Veeder and others*, (*Id.* 417.) These were all cases in which the names of the patentees had been used in trust for Sir William Johnson ; and the bill in each case, was filed by persons claiming through him, for a discovery and relief. The bills alledged that the names of the patentees had been used for the benefit of Sir William Johnson; and that, after the patents had been issued, the patentees had conveyed to him ; and that the conveyances had been lost. Some or all of the defendants in each of the causes demurred to bill. One cause of demurrer stated in each case, was, in substance, "that the agreement, alledged to have been made, between Sir William Johnson and the patentees was illegal and not entitled to the aid of a court of equity." The chancellor allowed the demurrers, and the causes were taken by appeal to the court for the

correction of errors, where Benson, justice, gave the opinion of the court, and in relation to the above cause of demurrer, he said, "The supposed illegality of the agreement between the original patentees and Sir William Johnson, consists in its being in contravention of the instructions from the king to the governor, restraining the patents for lands to a quantity not exceeding 1000 acres to each patentee. The futility of this regulation was soon discovered, and the instruction was for near half a century before the patent mentioned in the bill issued considered altogether as a *dead letter*, and a compliance with it *a mere matter of form*," &c. The opinion of Justice Benson is entitled to great respect ; he was a distinguished lawyer before the revolution ; he was the attorney general of the state during the war, and appointed a justice of the supreme court in the year 1794. He must have been well acquainted with the manner of doing business under the colonial government. These causes brought to the notice of the court for the correction of errors, patents for more than 93,000 acres of land, which had been granted to trustees for the benefit of Sir William Johnson. That court was, in part, composed of one branch of the legislature; and if it was then deemed good cause for vacating letters patent, that the patentees named in the patent were trustees for others, how did it happen that the then agents of the people did not take the necessary steps to have the patents vacated ? The late Chief Justice Spencer was then of counsel for some or all of the respondents ; and within three years thereafter, he was appointed attorney general; and if he believed these patents invalid, it was his duty to have commenced proceedings to vacate them. But he did no such thing ; and no man living will say that he ever neglected a public duty.

In the case of the *Mayor of Hull* v. *Horner*, (*Cowper's Rep.* 110,) Lord Mansfield said, "I remember in general, though I can not recollect the particulars of it, a case in the *Dutchy Court*, between the king and Mr. Brown of Snelbrook. It was before the late *nullum tempus* bill. The evidence in support of the title was, a possession and enjoyment of one hundred years; and I held that though such possession and enjoyment could

not conclude as a positive bar, because there was no statute of limitations against the crown, yet it might operate as evidence against the crown of right in the defendant, if the claim could have a legal commencement, though such commencement could not be shown." Even without a patent, and without a statute of limitation, Lord Mansfield held that a possession of one hundred years was evidence of a right against the crown.

In the case of the *Attorney General* v. *Vernon, Brown and Boheme*, already referred to, the patent was issued on the 31st of November, 1683, and the cause was first before the court for argument in Michaelmas term, 1684; and the counsel for the defendants in that case, in order to show the danger of questioning the validity of letters patent by English bill in chancery, said, "And since *nullum tempus occurrit regi*, nothing hinders but they may go back and repeal letters patent made by King James, or as much further back as they please." To which the attorney general (at page 281) answered: "There could be no such danger, as was pretended, to ancient patents; for that the equity will not be the same against an ancient patent when there has been a long enjoyment under it, as against a patent newly passed and fresh in agitation; and as to ancient patents, it shall *be presumed* the king intended a bounty, which will alter the case." On the second argument, the counsel for the defendants (at page 386) said, " It is a matter much in derogation of his majesty's grants, that they should be impeached on the pretenses in the information, and of dangerous consequence to all patentees, especially if the *succeeding* king shall avoid his predecessor's grant on pretense of an over value." The lord chancellor answered that objection, (on page 390,) by saying: "As soon as the late king was informed of the over value, he gave directions for setting aside this patent, which answered the objection of a succeeding king's avoiding his predecessor's grants." The lord chancellor must have supposed there was some force in the objection, or he would not have answered it.

The king, in whose time the letters patent now the subject of consideration were granted, lived about twenty-three years after they were issued, but made no objection to them; and his suc-

cessor remained the acknowledged sovereign of the colony of New-York until the 14th of October, 1775, and he made no attempt to impeach them. But did he do nothing to confirm them? Although it be true that neither the king nor the plaintiffs are to be bound by the acts of agents, yet it may be insisted that public acts of legislation are not to be regarded as the acts of agents, but of the sovereign; and when a thing is demanded by a public law, it goes in confirmation of the contract in virtue of which the demand is made, as much so as an individual would confirm a contract by reiterated demands of its performance by the other party. It has already been stated, that the lands in dispute were granted subject to the payment of an annual rent about equal to $83, payable to the king or his successors. After the death of King George the second, and on the 8th day of January, 1762, and more than twenty-four years after the letters patent were issued, the colonial legislature passed an act entitled "An act for the more effectual collecting of his majesty's quit-rents in the colony of New-York." By the first section of that act, provision was made for the collection of quit-rents due on grants made to towns; and the second section begins as follows: "And for the more regular and orderly collecting, gathering and paying quit-rents due and to become due from *all other grants* and patents for lands within this colony, Be it enacted," &c. Here is a demand by a public law of the rent then due upon the letters patent which are now the subject of consideration; and by the 4th section of the act, provision was made for the sale of the lands unless the quit-rents were paid. Whether they were paid, can not be the subject of inquiry upon this demurrer; but, a public law demanding payment of the rent, may, as well as any other public law, be looked at in deciding the questions raised by the demurrer.

Have not these letters patent been confirmed by the plaintiffs, either expressly or by implication? When the plaintiffs, on the 20th day of April, 1777, made a constitution, they ordained " that all grants of land within this state, made by the king of Great Britain, or persons acting under his authority, after the 14th day of October, 1775, should be null and void; but that

nothing in this constitution contained shall be construed to affect any grants of land within this state made by the authority of said king or his predecessors, or to annul any charters to bodies politic, by him or them, or any of them, made prior to that day." Although this part of the constitution does not in terms confirm all previous grants, yet, from that day until this action was *ordered,* it has been regarded as such confirmation. How otherwise has it happened that the records of no court in this state show that the plaintiffs, from the 14th day of October, 1775, until this action was commenced, ever made an effort to take from a citizen his lands, under pretense that the letters patent under which he claimed were obtained from King George the second by fraud ? Every man who, on the 20th day of April, 1777, owned an inch of land in this state, held it under a grant from the king, or under a Dutch grant; and who for a moment can suppose that the men who made and sanctioned the constitution would have consented to it, if they had understood that their title to the lands on which they had lived for forty years might, at any time before the year 1850, be taken from them or their children, because the king had been cheated in the year 1737 ?

The plaintiffs were, from 1776 to 1783, engaged in a war with the king, to take from him all his lands, tenements and hereditaments, south of what is now the south line of the Canadas, and east of the Mississippi to the Atlantic ocean ; but before they were half through that war, being confident of ultimate success, they, by their senate and assembly, on the 22d day of October, 1779, enacted, " That the absolute property of all messuages, lands, tenements and hereditaments, and of all rents, royalties, franchises, prerogatives, privileges, escheats, forfeitures, debts, dues, duties and services, by whatsoever names respectively the same are called and known in the law; and all right and title to the same, which, next and immediately before the 9th day of July in the year of our Lord 1776, did vest in or belong, or was or were due to the crown of Great Britain, be, and the same and each and every of them hereby are declared to be, and ever since the said 9th day of July in the year of our Lord 1776, to have been,

and forever shall be, vested in the people of this state, in whom the sovereignty and seigniory thereof are and were united and vested, on and from the said 9th day of July in the year of our Lord 1776." (1 *Greenl. L. N. Y. p.* 31, § 14.) There are no words in this section sufficiently broad to cover the claim now made by the plaintiffs. They did not, in that section, profess to claim more than belonged to the king immediately before the 9th day of July, 1776 : they were then at war with, and intended to take from him all that could be called his ; but it can not be supposed that they intended to disturb each other's title to lands which they respectively then held under the crown.

They did not profess to claim every *right of action* which the king then had. Had he retained his sovereignty over the colony of New-York, he might probably have prosecuted each member of that senate as a rebel and traitor, and forfeited all his lands and tenements. The plaintiffs have claimed no such right ; but they did claim all the lands, *rents*, forfeitures, debts, dues, and right and title to the same, which, next and immediately before the 9th day of July, 1776, did vest in or belong, or was or were due to the crown.

The title to the lands granted by the letters patent now in question, was not vested in the king immediately before that day : he never had that title ; his predecessor granted it away in 1737. But a right to the *rent* was *vested* in the king ; and that *rent* the plaintiffs, by the act just referred to, enacted should be vested in them forever thereafter ; and on the first day of April, 1786, they passed an act entitled " An act for the collection and commutation of quit-rents." By the 4th section of that act, it was enacted, " that whenever there shall be three years' quit-rent due and in arrear upon *any grant or patent for lands in this state,* or upon any lands contained in such grant or patent, it shall and may be lawful for the treasurer of this state for the time being, and he is required to give notice," &c. Provision is then made for the sale of lands on which the quit-rents should not be paid in pursuance of such notice. By this act the plaintiffs made it the duty of their treasurer to demand payment of the quit-rents due or to become due in virtue of the letters patent

The People v. Clarke.

now the subject of controversy; and this was more than forty-eight years after the grant was made.  What would be said of an individual, who should make a lease in fee, reserving an annual rent, and after demanding payment of the rent year after year for forty-eight years, then turn upon his tenant, and say to him, "Deliver up your land and your lease: your great-great-grandfather obtained it from me by false representations?" But these demands of rent, proved by public law, are not the only evidence which that law furnishes of the plaintiffs having confirmed the grant.  It can not be denied that the plaintiffs intended, by the third section and the proviso in the act of the 9th of March already referred to, to waive the performance of the conditions of settlement, in case the owners of the land had paid or should pay the quit-rents and commutation of quit-rents. But it can not be supposed that the plaintiffs intended to induce the owners of lands granted by the crown to pay the quit-rent and commutation of quit-rents, and then say to them, "You have emptied your pockets into the treasury of the state, and for that we waive the performance of the conditions of settlement contained in the grant to you; but we will now take your lands from you, because your great-great-grandfather, one hundred and twelve years since, aided William Corry to cheat King George the second!"  Such conduct would be inconsistent with good faith and the honor of the plaintiffs.

Although the question whether the quit-rent and commutation of quit-rents have been paid, can not arise on this demurrer, the intent of the plaintiffs in passing the law is a proper subject to be inquired after.  The law shows that all the plaintiffs then claimed from those who held under grants from the crown was the payment of the quit-rent and commutation of quit-rents. The fact that the plaintiffs have never before this commenced an action to vacate a grant made by the king, because it was made upon false suggestions, furnishes strong evidence that the plaintiffs never had the right to bring such an action.  It was Littleton's rule, "Whatever never was, never ought to be." (1 *Vernon*, 385.)

I have thus far examined the case, with a view of showing

that the plaintiffs' claim is, at least, a doubtful one, though all statutes of limitation were to be disregarded. I will now examine the question, whether this action is barred by any statute of limitation.

It was a rule of the common law, that no time ran against the king. If he commenced an action, it could not be said to him, " Your action is barred by the lapse of time." But the British parliament were not satisfied with this prerogative of the king. They deemed it necessary that the subject should be protected against the stale claims of the crown, as well as against the claim of a fellow subject. " By the statute 21 Jac. 1, ch. 2, a time of limitation was extended to the case of the king, to wit : sixty years precedent to the 19th February, 1623. But this becoming ineffectual by efflux of time, the same date of limitation was fixed by statute 9 Geo. 3, ch. 16, to commence and be reckoned backwards, from the time of bringing any suit or process, to recover the thing in question, so that possession for sixty years· is now a bar even against the prerogative, in derogation of the ancient maxim, ' *nullum tempus occurrit regi.*' " (3 *Black. Com.* 306, 307.) The British parliament supposed that if the letters patent had been obtained by false suggestions, justice demanded that the king should not, after the lapse of sixty years, be allowed to commence any proceeding whatever to vacate his grant. This statute of 9 Geo. 3, was passed in the year 1769, about 32 years after these letters patent were issued ; and the moment that act took effect, Geo. 3 had only about 28 years in which to commence any proceedings to vacate the letters patent because obtained upon false suggestions ; and had he retained his sovereignty over the colony of New-York, his right of action for that cause would have been barred on the 19th day of November, 1797 ; and his right of action, if any he ever had, for the non-performance of the conditions of settlement, would have been barred, one on the 19th of November, 1800, and the other on the 1st of May, 1805. The statute of 9 Geo. 3, formed a part of the law of the colony of New-York . on the 19th day of April, in the year 1775 ; and by the 35th

section of the constitution of 1777, it was made a part of the law of this state.

If it be admitted, which it is not, that the plaintiffs succeeded to all the *rights of action*, and the *rights of entry* for conditions broken, which then belonged to the king, what rights had he as to the lands in question? All he could then claim was to commence proceedings at any time before the 19th day of November, 1797, to vacate the letters patent, or to have an inquest before the 1st of May, 1805, to forfeit the estate of the patentees for the non-performance of the conditions of settlement; and the plaintiffs can not reasonably claim that they were not limited to the same time that the king was, under whom they claim. The plaintiffs did not intend to claim as much time in which to prosecute, as was allowed to the king. They intended that no citizen should have cause to lament that a seven years' struggle for independence was crowned with success, and therefore they, on the 26th day of February, 1788, and more than fifty years after the letters patent now under consideration were granted, passed an act entitled " An act for the limitation of criminal proceedings and of actions and suits at law"—which begins with a preamble as follows : *" Whereas it is necessary for the peace of society, that certain times be limited for bringing all actions and suits at law."*—The first section of this act is substantially a copy of the first section of the statute of 9 Geo. 3, ch. 16, and begins as follows : " 1. Be it enacted by the people of the state of New-York, represented in senate and assembly, and it is hereby enacted by authority of the same, that the people of the state of New-York *shall not nor will*, at any time after the first day of January, which will be in the year 1800, sue, impeach, question or implead any person," &c. This section seems to contain many unnecessary words ; and as it was admirably abbreviated by the late Chancellor Kent, and the late Judge Jacob Radcliffe, in the first section of an act in 1 R. L. of 1801, page 562, I shall cite the whole of that section instead of the first section of the act of 1788. The first section of the act of 1801, is as follows : *" Be it enacted by the people of the state of New-York, represented in senate and assembly,* That

the people of this state will not sue or implead any person, body politic or corporate, for or in respect to any lands, tenements or hereditaments, other than liberties or franchises, or the issues or profits thereof, by reason of any right or title of the said people to the same, which shall not have accrued within the space of forty years before any suit or other proceeding for the same be commenced, unless the said people or those under whom they claim, shall have received the rents and profits thereof, or of some part thereof, within the said space of 40 years; and in every case where such title shall not have accrued within the time aforesaid, unless such rents and profits shall have been received as aforesaid, the persons, body politic or corporate holding such lands, tenements or hereditaments, other than liberties or franchises, shall freely hold and enjoy the same against the said people, and also against all persons claiming by or under them, except such persons shall claim by virtue of any letters patent from the said people, made upon suggestion of concealment or wrongful detaining, or defective title, upon which a verdict, judgment or decree in some court of record in this state, shall have been given for such lands, tenements or hereditaments in favor of the said people, or of such patentee or grantee, his or their heirs or assigns, within the said space of forty years before commencing any suit or other proceeding for the same."

If the plaintiffs can be bound by any act passed by their representatives, they must have been bound by this act; and after the first day of January, 1800, they could not sue, impeach, question or implead any person for or in any wise concerning any manors, lands, tenements, rents or hereditaments whatsoever, or for or in any wise concerning the revenues, issues or profits thereof, or make *any challenge or demand* of, in or to the same, by reason of any right or title which had not accrued or grown, or which should not thereafter first accrue and grow, within the space of forty years next before the filing, issuing, or commencing of every such action, bill, plaint, information or other suit or proceeding. The question here is, when did the cause of action now claimed by the plaintiffs accrue—not, when did they wrest it from the king? The complaint shows that

The People *v.* Clarke.

the right of action, for three of the causes set up in the complaint, accrued on the 19th day of November, 1737; and for the non-performance of one of the conditions of settlement, on the 19th day of November, 1740; and for the other on the first day of May, 1745. And the 40 years limited in the act last referred to, expired as to the first three grounds of complaint on the 19th of November, 1777; and for the other on the 19th of November, 1780, and on the first of May, 1785. But by the 15th section of that act, no part of the time between the 14th of October, 1775, and the 21st of March, 1783, was to be taken as a part of the time limited; and then the plaintiffs were barred within the year 1786, as to three causes of complaint; and in the years 1789 and 1793, as to the forfeiture for the non-performance of the conditions of settlement. And if the statute is deemed not to have commenced running against the plaintiffs until the 21st March, 1783, then they were barred in the year 1823. It is not, therefore, in this action a question of any importance whether the statute commenced running before or on the 21st March, 1783; because, in either case, the plaintiffs are barred, if they can be barred by any statute of limitation.

In this first section of the act of 1801, the revisers and the legislature used the words "*will not,*" instead of the words "*shall not nor will.*" But it can not be supposed that they intended by the change of phraseology, to weaken the force and meaning of the revised act and make it *no law*, but a mere promise, which the plaintiffs were at liberty to disregard whenever they pleased. What does an individual say when he intends to bind himself? Does he not say *I will*, or *I will not*? So when the plaintiffs were making a law to bind themselves, the words "will not sue," &c. imposed on them the obligation of a law, the force of which would not have been increased by the substitution of the words "*shall not nor will,*" instead of the words "will not." When the plaintiffs intended to bind themselves, the most appropriate words they could use were, "the people of the state *will not sue,*" &c.; but, whether the first part of the section of the act of 1801, be or be not weakened by the use of the words, "*will not,*" instead of the words

" *shall not nor will,*" by the subsequent part of the section, un-
less the title and right to sue has accrued within forty years, or
the plaintiffs have received the rents and profits within that time,
the person holding such lands *shall* freely hold and enjoy the
same *against the plaintiffs,* &c.

The defendant in his answer, to which the plaintiffs have de-
murred, has alledged that no right or title to the lands in ques-
tion has accrued to the plaintiffs within forty years before the
commencement of this suit, and that neither the plaintiffs nor
those under whom they claim, have received the rents and profits
of the said lands, within the space of forty years before the
commencement of this suit, and that ever since the conveyance
by Edward Clarke to the defendant's father, as therein before
mentioned, [in 1791,] he, the defendant, and his said father, and
those deriving title from the defendant, have respectively been
in the indisputed possession and enjoyment of the said lands,
and have received the rents and profits, claiming in good faith
to own and be seised of the said lands in fee adversely to the
plaintiffs and every other person whatever. All the facts stated
in this answer, are admitted by the demurrer. The plaintiffs
have stated, as the grounds of demurrer, the following : " That
said several matters do not, nor do any or either of them consti-
tute any defense to the matters alledged in the complaint." The
matters stated in the answer must be examined in connection
with the matters stated in the complaint, in order to ascertain
which of the parties are entitled to judgment.

The complaint shows that the letters patent, to vacate which
this action was commenced, were granted under the great seal
of the colony of New-York, on the 19th of November, 1737, to
William Corry and twelve others. This proves that the title
then passed out of the king, and vested in the patentees ; that
the twelve associates of William Corry conveyed their interest
in the lands to him. This shows that the title to the whole was
in him, on the 14th or 15th of December, 1737. The plaintiffs
then alledge in their complaint, that William Corry conveyed
one half, being 12,700 acres of the said lands, to Lieutenant
Governor George Clarke. Thus the plaintiffs show that the

---

The People *v.* Clarke.

---

title to 12,700 acres was in him. The plaintiffs then alledge, that the defendant George Clarke, a descendant of the said Lieutenant Governor George Clarke, now possesses and claims to own under the said letters patent, by inheritance or purchase, all the right, title and interest in the said lands conveyed to the said Lieutenant Governor Clarke.

The plaintiffs by their complaint show, that they never had any title to the lands—that they never had the possession, nor received the rents and profits thereof—that all they ever had, or claim to have had, was several causes of action, the last of which accrued to the king, under whom they claim, on the 1st of May, 1745, more than one hundred and five years since. I am inclined to believe that it appears upon the face of the complaint, that the claim of the plaintiff is barred by the statute of limitations, and if so, the defendant might safely have demurred to the complaint. "When it appears upon the face of the bill that the plaintiff is barred by the statute, the defendant may demur." (*Story's Equity Pleading*, § 503.) "To enable a defendant to take advantage of the statute of limitations, upon demurrer, it must distinctly appear by the bill itself, that the complainant's remedy is barred by lapse of time." (3 *Barb. Chan. Rep.* 481.) The first question, however, raised by the demurrer is, has the defendant stated enough in his answer of the statute of limitations to bar the plaintiffs' action? I am of opinion that he has stated not only all, but more than was necessary.

The second ground of demurrer is, that no grant or patent from the crown of Great Britain, prior to the revolution, or from the people of the state of New-York since that event, is set up or pretended therein. But as the plaintiffs had shown in their complaint that there was a grant from the crown of Great Britain prior to the revolution, and that the defendant was in possession claiming under that grant, it was unnecessary for the defendant, in his answer, to alledge that such a grant had been made.

The third ground of demurrer is, " that no such adverse possession as is set up in that part of said answer, can be taken or

held against the plaintiffs." Why not? Although at the common law the king could not be disseised, and if a person entered upon the lands belonging to the crown he was regarded as a mere intruder, not a disseiser, and if he remained and died upon the land he acquired no rights either for himself or his heirs; and although the plaintiffs, when they became sovereign and independent, might have claimed the benefit of the same rule; yet, the plaintiffs, by the act already referred to, of the 26th of February, 1788, gave to a possession held against them for forty years the same effect as if held against an individual; and it is now too late to say, that an adverse possession can not be held against the king or the plaintiffs.

The fourth and last ground of demurrer is "that no statute is referred to, nor is the benefit of a particular statute of limitation claimed or pretended as a bar to the relief demanded by the complaint." The statutes of limitations are public laws, and need not be referred to in a plea or answer. It was formerly enough to state the facts which showed the case to be within the statute, (2 *Chit. on Plead.* 449,) and nothing more is required by the code.

The learned counsel for the plaintiffs insisted, that, "there is no statute of limitations barring the plaintiffs from instituting a proceeding in the nature of a *scire facias* to repeal letters patent." A suit or action is defined to be "the lawful demand of one's right." (3 *Bl. Com.* 116.) And whether the suit or action be commenced by *scire facias, capias ad respondendum,* or summons and complaint, can not vary its essential character. If it be a lawful demand of one's right, made in court, it must be an action.

In the act entitled "an act for the amendment of the law and the better advancement of justice," passed 27th February, 1788, by the 1st and 2d sections, a defendant who recovers a judgment against an executor plaintiff, may have an action of debt or a *scire facias* on the judgment. So when special bail became liable, an action of debt or *scire faciae* might be brought. But a proceeding in either, would be "a lawful demand of one's right," and would therefore be an action. An action by *scire*

The People *v.* Clarke.

*facias* could only be brought upon matter of record. The king might commence an action by *scire facias* to repeal his own letters patent; but in such case, as has already been said, the deceit or false suggestion must appear in the body of the grant.

It has been insisted that a proceeding by a *scire facias* to repeal letters patent, was not an action or suit at law, and was not therefore within the statute of limitations. In England, in the chancery, there are two courts. The ordinary, where the chancellor or keeper proceeds according to the *common law ;* and it was out of that court that the writ of scire facias issued, and in that court all the proceedings were had upon such writs. (2 *Com. Dig. tit. Chancery, C.* 1.) The other was a court of equity, the proceeding in which was by English bill. (*Id. letter C.* 5.) But suppose a proceeding by *scire facias*, to repeal letters patent, because granted upon false suggestions, is a proceeding in equity—the words of 9 Geo. 3, ch. 16, and the act of the 26th February, 1788, are sufficiently broad to include such a proceeding. The words of the latter act are, " the people, &c. shall not nor will sue, impeach, question or implead any person, &c. for or in any wise concerning any lands, &c. or to make any *title,* claim, challenge or demand," &c. Have not the plaintiffs commenced an action against the defendant? Have they not sued him? Have they not questioned and impleaded him to impeach his title? In the case of *Hovenden* v. *Lord Annesley,* (2 *Sch. & Lef.* 607,) the lord chancellor, at page 629, said, " But it is said that courts of equity are not within statutes of limitations. This is true in one respect: they are not within the words of the statutes, because the words apply to particular legal remedies ; but they are within the spirit and meaning of the statutes, and have been always so considered. I think it is a mistake in point of language, to say that courts of equity act merely by analogy to the statutes: they act in obedience to them." Again, at page 631, he said, " I have looked at a great number of cases, for the purpose of seeing how far this rule has been adopted at different times; and I think it impossible not to see that courts of equity have constantly guided themselves

by this principle, that wherever the legislature have limited a period for law proceedings, equity will, in analogous cases, consider the equitable rights as bound by the same limitation." If the questions in this cause may be deemed to belong to a court of equity, I can not persuade myself that they are therefore never to be put at rest by lapse of time. It would be an alarming doctrine to hold that every man in the state, who holds any land under a grant before the revolution, may be turned out of possession by the plaintiffs, if a king was cheated, who, one or two hundred years since, made the grant. But the question whether a proceeding to vacate letters patent, because the condition of settlement has not been performed, be a proceeding at law or in equity, is no longer an open question. By the 1st and 3d sections of the act of the 9th of March, 1793, already referred to, such proceedings are at law. Although the writ by which they were commenced was issued out of chancery, and the inquisition returned into that court, yet if the inquisition was traversed by any person aggrieved, the record was then sent into the supreme court, there to be tried and determined according to law; and if judgment was rendered for the people, a writ was issued out of that court to the sheriff of the county in which the lands were, commanding him to seize and take the lands into the hands of the people. So, if 2 R. S. 578, § 12, be not, as I hold that it is, confined to letters patent granted by the people of this state, it shows that all proceedings to vacate letters patent, for any cause, must be at law.

A court of equity has at no period been a court to which resort could be had to enforce a forfeiture or penalty. In the case of *Livingston* v. *Tompkins*, (4 *John. Ch.* 431,) Chancellor Kent said, "It may be laid down as a fundamental doctrine of the court, that equity does not assist the recovery of a penalty or forfeiture, or any thing in the nature of a forfeiture." This is an action, in part at least, to enforce a forfeiture for the non-performance of the conditions of settlement contained in the letters patent. And here it may be asked, why the 12th section of 2 *R. S.* 578, was in terms confined to letters patent granted by *the people of this state?* The statutes were revised by three

members of the bar, who were then and still are amongst the most learned and distinguished lawyers in the state; and why did they, and the legislature, limit the remedy to grants made by the people of this state? Could this have been done for any other reason, than because they and the legislature knew that any right of action which the plaintiffs wrested from the king by the revolution, was barred by the statute of limitations, long before the statutes were revised? The learned revisers knew that it would be idle, if not ridiculous, to provide a remedy for cases which could not exist. The same answer may be given to the question, why did the commissioners of the code, and the legislature of 1849, confine section 433 to letters patent granted by the people of this state? The learned counsel for the plaintiffs has insisted, that "the only statute that can be referred to in the answer, or which can be applicable to the facts it sets up, is the 75th section of the code; that this was the only existing law by which it can be claimed that the conduct of the plaintiffs, at the time this proceeding was commenced, was regulated." Section 73 of the code must have escaped the notice of the learned counsel. By that section it is enacted that title number two, in which section 75 is included, "shall not extend to actions already commenced, or to cases where the right of action *has already accrued.*" Section 75, therefore, has no application to this case. So section one, article one, chapter four, part third of the revised statutes, was, by section 45 of the same chapter, limited to causes of action which thereafter accrued; and if there be any statute of limitation applicable to this case, it is either the act of the 26th February, 1788, chapter 43, or the revised act of the 8th of April, 1801, chapter 103. Be it one or the other, the effect in this action must be the same. The time limited in both being the same, the defendant's answer may be deemed to have reference to the one the most applicable to his case.

It was also alledged by the learned counsel, that section 77 of the code "shows that section 75 was not intended to embrace a proceeding to annul a patent;" that "the 77th section shows that no matter what may have been the length of time a party occupied land under a patent adjudged void, the people can re-

cover the same, if they sue within twenty years after such judgment." The 77th section does not show that plaintiffs can be entitled to a judgment annulling letters patent, if the patentees or those claiming under them have been in possession more than forty years. Such judgment, however, takes from the defendant all benefit and claim under his former possession, and gives to the plaintiffs a *new cause* of action. In case the defendant remains in possession a moment after the judgment is rendered annulling his title, from that moment he becomes an intruder, and his possession becomes unlawful. But if that wrongful possession be continued twenty years, the new cause of action which the people acquire by the judgment, will be barred.

I have been referred to the opinion of Mr. Justice Johnson, in the case of *The People* v. *Arnold,* and especially to that part in which it is said : " A disseisor of the people, or an adverse possession as against them, being a legal impossibility, allegations to that effect in the answer would, I think, have been good cause of demurrer." The answer in that case contained no such allegation, and all that Mr. Justice Johnson was called on to decide was, whether they were necessary—whether the answer was sufficient without them. And I think he properly decided, that the answer was sufficient; but I am not prepared to say, that if a "legal impossibility" be alledged in an answer, it vitiates the answer and furnishes good ground of demurrer, under the code. It might probably be disregarded as surplusage, or it might be struck out as "irrelevant or redundant matter." (*Code,* § 160.) But whether that be so or not, the plaintiffs have not demurred to the answer, because it is alledged therein, "that the defendant and his father have been in possession, and have received the rents, issues and profits thereof, claiming the same in good faith to own and be seised of the said lands and all the hereditaments thereunto belonging, in fee, adversely to the said plaintiffs, and to every person whatever ;" but they have demurred, because "that no such adverse possession as is set up in that part of said answer, can be taken or held against the plaintiffs." It was not legally impossible that the defendant did receive the rents and profits "*claiming* in good

The People *v.* Clarke.

faith to own and be scised of the said lands, &c. in fee, adversely to the said plaintiffs," &c.

Grant that by the common law, the plaintiffs could not be disseised or put out of possession of lands to which they had title, that rule can not be applied to this case, for the record shows, as has before been said, that the plaintiffs never had the title or possession. The letters patent, which they seek to annul, were not void—the title passed by them. As the defendant was in possession, claiming under them, (as is shown by the complaint and answer,) he could with legal propriety say that he *claimed* adversely to the plaintiffs. Although by the common law the people could not be disseised or put out of possession, it was competent for the legislature to alter that rule, and give to a possession held against the people the same force and effect as a possession held against an individual; and the legislature have done so in the various statutes of limitations which have been referred to.

Whatever will constitute an adverse possession within the meaning of sections 9, 10, 11 or 12, of 2 R. S. 292, if continued 40 years under the act of 1788 or 1801, gives to the person in possession a perfect title as against the people. 2 *R. S.* (*2d ed.*) 456, § 17, and the revisers' original note to section 14, 3d *R. S.* (*2d ed.*) 778, show that the legislature intended to put an end to prerogative; and that the same rules should be applied to an action between the people and a citizen, as between one citizen and another.

It has also been insisted on the part of the plaintiffs that this action is not within any statute of limitations, because it is "not a suit or proceeding for or in any wise concerning any lands, or for or in any wise concerning the revenues, issues or profits thereof, and makes no title, claim, challenge or demand of, in or to the same." (*Act of 26th February,* 1788, *before referred to.*) If this be not a suit or proceeding for or in respect to any lands; if the plaintiffs do not thereby "make any title, claim, challenge or demand of, in or to any lands," why was the defendant, for the reason that he was in possession and claimed title to the lands in question, made a party to this action? If the suit, be

the result of it what it may, is in no wise concerning the lands possessed and claimed by the defendant—if the plaintiffs do not by this action make any title, claim, challenge or demand of, in or to the lands possessed or claimed by the defendant, any other person in the state might as well have been made defendant. But the plaintiffs, by this action, make title, claim, challenge and demand of, in and to the lands possessed and claimed by the defendant. The avowed object of the action is to take away his title, and establish that of the plaintiffs. No action or suit can be imagined more directly concerning lands. If the letters patent are concerning lands, an act for their destruction must be so.

A judgment in this action, in favor of the plaintiffs, will be conclusive evidence that they have a perfect title to the lands in question. As soon as the record of such judgment is filed in the secretary's office, the commissioners of the land office may sell the lands " in the same manner as if the letters patent had never been issued." (2 *R. S.* 580, § 25.) And such judgment will show that the defendant has no title, and that he is an intruder and wrongfully in possession. I am, therefore, of opinion:

*First.* That this action is not warranted by the 433d section of the code, as that, as I understand it, is limited to letters patent, granted by the people of this state.

*Secondly.* If the action be warranted by the code, the facts stated in the complaint show that the plaintiffs never had any title or possession, and do not show that any right of action has accrued to them, or the king under whom they claim, within 40 years next before the commencement of the action; and,

*Thirdly.* That if the complaint does not show that the plaintiffs' right of action, if any they ever had, is barred by the statute of limitation, the defendant's answer, to which the plaintiffs have demurred, does, in connection with the complaint, show that any right of action which the plaintiffs may have had, is barred by the statute of limitations, and that the defendant is entitled to judgment on the demurrer.